UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CATALYST CAMPUS FOR TECHNOLOGY AND INNOVATION, INC.; THE O'NEIL GROUP COMPANY, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ANIZA BROWN; ROSIE PROJECT; OGDEN CITY; WEBER STATE UNIVERSITY, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT WEBER STATE UNIVERSITY'S MOTION TO DISMISS AND DEFENDANT OGDEN CITY'S MOTION TO DISMISS** <br><br> Case No. 1:24-cv-00059-AMA-DAO <br><br> District Judge Ann Marie McIff Allen <br><br> Magistrate Judge Daphne A. Oberg |

This matter comes before the Court on Motions to Dismiss filed by Defendants Weber State University[1] and Ogden City.[2] For the reasons discussed below, the Court grants Weber State University's Motion to Dismiss in full. The Court also grants Ogden City's Motion to Dismiss in full.

**BACKGROUND[3]**

Plaintiff The O'Neil Group Company, LLC ("OGC") is a business and real estate investment group with particular specialization in technology, defense, and aerospace sectors.[4] Plaintiff Catalyst Campus for Technology and Innovation Inc. ("CCTI") is a nonprofit OGC

---

[1] ECF No. 54, filed January 22, 2025.

[2] ECF No. 53, filed January 22, 2025.

[3] The facts below are taken from Plaintiffs' Second Amended Complaint ("SAC"). ECF No. 51. For the purposes of the Motions at issue, the Court will treat the facts alleged in the SAC as true.

[4] ECF No. 51 ¶ 19.

subsidiary.[5] Defendant Aniza Brown is a former Executive Director at CCTI.[6] Defendant Rosie Project is a nonprofit business entity created by Ms. Brown.[7] Defendant Ogden City ("Ogden") is a Utah municipal corporation.[8] Defendant Weber State University ("WSU") is a state-funded, public university.[9]

OGC partners with public entities to invest in and develop secure facilities where government and business leaders can collaborate in the aerospace and defense industries.[10] These secure facilities are called "Catalyst Campuses."[11] Due to the secure nature of a Catalyst Campus, a significant aspect in establishing such a campus is the construction of Sensitive Compartmented Information Facilities ("SCIFs").[12] SCIF construction requires various permits, security clearances, and specific building requirements,[13] and the complex and expensive process takes approximately five years to complete.[14] OGC has knowledge and experience in constructing SCIFs,[15] upon the building of which CCTI then administers government and private

---

[5] *Id.* ¶ 20.

[6] *Id.* ¶ 60.

[7] *Id.* ¶ 104.

[8] *Id.* ¶ 14.

[9] *Id.* ¶ 15.

[10] *Id.* ¶¶ 21, 24.

[11] *See id.* ¶¶ 23–24 (describing a Catalyst Campus in Colorado Springs).

[12] *Id.* ¶ 26.

[13] *Id.* ¶ 27.

[14] *Id.* ¶¶ 27–28.

[15] *Id.* ¶ 29.

industry programs on the Catalyst Campus.[16] Plaintiffs developed and currently operate a Catalyst Campus in Colorado Springs, Colorado.[17]

In early 2021, OGC, CCTI, Ogden, WSU, and Hill Air Force Base ("HAFB") began to consider establishing a Utah Catalyst Campus in Ogden.[18] To finance the venture, WSU sought funding through two funding sources: (1) the U.S. Department of Education ("DOE")[19] and (2) the Utah legislature.[20] Around April 2021, WSU submitted a request for $4.8 million from the DOE.[21] While awaiting DOE approval, WSU asked OGC to buy the Washington Building,[22] which was intended to be used as a temporary location to house the Utah Catalyst Campus until a viable location for the SCIF was identified.[23] OGC purchased the Washington Building on August 9, 2021, after which it renovated the building for around $3.5 million with the understanding that WSU would purchase the building from OGC when it received funding.[24]

In March 2022, the state legislature passed an appropriation of $20 million to construct and operate a SCIF in downtown Ogden.[25] The appropriation was allocated to the Governor's Office of Economic Opportunity ("GOEO") with direction that funding would flow through

---

[16] *Id.*

[17] *Id.* ¶ 23.

[18] *Id.* ¶¶ 32–39.

[19] *Id.* ¶ 40.

[20] *See id.* ¶ 50 (Utah State Senator Jerry Stevenson informing WSU president that no funding decision would be made during the May 2021 legislative session).

[21] *Id.* ¶ 40.

[22] *Id.* ¶ 43.

[23] *Id.* ¶ 44.

[24] *Id.* ¶¶ 57–59.

[25] *Id.* ¶ 78.

WSU to build a secured building.[26] OGC remained active in pursuing a potential permanent

building site for the Utah Catalyst Campus,[27] but OGC failed to secure a site.[28] After about a

year, WSU arranged with GOEO to move the funds to a WSU account.[29] In mid-2023, CCTI met

with WSU about the necessity of OGC's involvement and the importance of the SCIF space.[30]

WSU never purchased the Washington Building from OGC.[31]

From July 2021 to June 2023, Ms. Brown worked as a CCTI executive director in Utah.[32]

On August 19, 2021, Ms. Brown was introduced to WSU's CFO via email.[33] Throughout her

employment, Ms. Brown acted as a direct liaison between CCTI, Ogden, and the military in

connection with the Utah Catalyst Campus.[34] In this capacity, and as an officer of CCTI, Ms.

Brown had access to OGC's business methods and processes for establishing a SCIF and

developing a Catalyst Campus.[35]

While working for CCTI, Ms. Brown convinced WSU, Ogden, and HAFB that OGC was

unnecessary to the process.[36] Ogden City and WSU in turn acquiesced and encouraged Ms.

Brown to cut OGC and CCTI out of the venture.[37] Ms. Brown also created her own nonprofit,

---

[26] *Id.* ¶ 80.

[27] *Id.* ¶¶ 90–91.

[28] *Id.* ¶ 92.

[29] *Id.* ¶ 94.

[30] *Id.* ¶ 98.

[31] *Id.* ¶ 99.

[32] *Id.* ¶¶ 60, 117.

[33] *Id.* ¶ 63

[34] *Id.* ¶ 65

[35] *Id.* ¶ 101.

[36] *Id.* ¶ 103.

[37] *Id.* ¶ 115.

Rosie Project, to partner with WSU and HAFB to do similar work to that done by OGC and CCTI.[38] In July 2023, WSU notified OGC that it would no longer work with OGC and CCTI.[39] WSU then continued to develop the Utah Catalyst Campus without OGC and CCTI.[40]

On April 12, 2024, OGC and CCTI ("Plaintiffs") filed suit against Ms. Brown and the Rosie Project.[41] Since then, OGC and CCTI have amended their complaint twice, adding Ogden and WSU as defendants.[42] Plaintiffs allege trade secret- and state law-related claims.[43] On January 22, 2025, Defendants Ogden and WSU filed separate motions to dismiss.[44] Plaintiffs filed responses to these motions on February 19, 2025.[45] Ogden and WSU filed their respective replies on March 14, 2025.[46]

## MOTION TO DISMISS STANDARD

Defendants bring their Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "Motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may take one of two forms": a party may make a facial challenge, questioning the

---

[38] *Id.* ¶¶ 104–05.

[39] *Id.* ¶ 119.

[40] *See id.* ¶¶ 119–21.

[41] ECF No. 1.

[42] ECF No. 12; ECF No. 51.

[43] ECF No. 51 (alleging (1) misappropriation of trade secrets under the Defend Trade Secrets Act; (2) misappropriation of trade secrets under Utah's Uniform Trade Secrets Act; (3) breach of fiduciary duty of loyalty; (4) aiding and abetting breach of fiduciary duty of loyalty; (5) breach of fiduciary duty of care; (6) aiding and abetting breach of fiduciary duty of care; (7) breach of fiduciary duty of good faith; (8) aiding and abetting breach of fiduciary duty of good faith; (9) intentional interference with economic relations; (10) fraudulent inducement; (11) negligent misrepresentation; (12) civil conspiracy; (13) breach of contract implied in fact; (13) breach of contract implied in law; and (14) breach of implied covenant of good faith and fair dealing).

[44] ECF No. 53; ECF No. 54.

[45] ECF No. 55; ECF No. 56.

[46] ECF No. 59; ECF No. 60.

sufficiency of the complaint, or a factual challenge, questioning the facts beyond the complaint upon which subject matter jurisdiction depends.[47] "In addressing a facial attack, the district court must accept the allegations in the complaint as true."[48] But "[i]n addressing a factual attack, the court does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents and a limited evidentiary hearing."[49]

Under Federal Rule of Civil Procedure 12(b)(6), a claim is subject to dismissal if the plaintiff's complaint fails to "state a claim upon which relief can be granted." In construing a plaintiff's complaint, the Court will assume the truth of any well-pleaded facts and draw all reasonable inferences in the light most favorable to the plaintiff.[50] To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"[51] "[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment."[52]

## DISCUSSION

In the Motions at issue, Defendants WSU and Ogden seek dismissal of all of Plaintiff's claims against them. Those claims include the following: violation of the Defend Trade Secrets Act ("DTSA"); misappropriation of trade secrets under the Utah Uniform Secrets Act ("UTSA"); aiding and abetting breach of fiduciary duty of loyalty; aiding and abetting breach of fiduciary

---

[47] *U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).

[48] *Id*.

[49] *Id*. (citation modified).

[50] *See Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011).

[51] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[52] *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

duty of care; aiding and abetting breach of fiduciary duty of good faith; intentional interference with economic relations; fraudulent inducement; negligent misrepresentation; civil conspiracy; breach of implied contract, both in fact and in law; and breach of the implied covenant of good faith and fair dealing.[53] Defendants Brown and Rosie Project filed an Answer[54] and did not move to dismiss. As such, the claims against those Defendants remain and will not be considered. The Court will first address the claims against WSU before turning to the claims against Ogden.

## A.    CLAIMS AGAINST WSU

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[55] In this way, "[t]he Eleventh Amendment constitutionalizes the doctrine of state sovereign immunity"[56] and jurisdictionally bars "unconsented suits in federal court against a state and arms

---

[53] Because Plaintiffs have invoked both diversity and federal question jurisdiction, the Court has jurisdiction over the state-law claims under diversity jurisdiction and cannot decline to exercise supplemental jurisdiction over them as may have been possible had only federal question jurisdiction been at issue.

[54] ECF No. 34.

[55] U.S. CONST. AMEND. XI. The Supreme Court has construed the Amendment to also "establish that an unconsenting State is immune from suits brought in federal courts by her own citizens." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (citation modified).

[56] *Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024). As the Tenth Circuit has explained, "[a] noteworthy point sometimes gets lost in the shuffle. Specifically, the sovereign immunity of states in not derived from the Eleventh Amendment itself. To the contrary, the Supreme Court has explained that sovereign immunity pre-dates the Eleventh Amendment[.]" *Good v. Dept. of Educ.*, 121 F.4th 772, 778 n.7 (10th Cir. 2024) (citation modified).

of the state."[57] WSU, as a state university, is an arm of the state and is thereby entitled to assert Eleventh Amendment immunity.[58]

Although WSU argues Eleventh Amendment immunity specifically in relation to Plaintiffs' DTSA claim, the immunity does not only apply to federal claims; rather, "[t]he Eleventh Amendment applies both to diversity jurisdiction and to federal question jurisdiction"[59] and to federal and state-law claims brought in federal court.[60] It is, in short, all-encompassing. There are, however, two limited exceptions to the immunity: "Congress may abrogate a state's Eleventh Amendment immunity[,]"[61] and a state may "waive its Eleventh Amendment immunity and consent to be sued."[62]

Neither exception applies here. The parties do not cite, and the Court cannot find, any language in the DTSA indicating that Congress abrogated Eleventh Amendment immunity. Indeed, other courts, when faced with this same question, have consistently determined that Congress did not abrogate sovereign immunity with respect to the DTSA.[63] Moreover, the state

---

[57] *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013).

[58] *Sethunya v. Weber State Univ.*, 382 Fed. App'x 793, 796 (10th Cir. 2010) (affirming district court's finding that WSU is an arm of the state of Utah and thus immune from suit under the Eleventh Amendment immunity) (unpublished); *Sussman v. Weber State Univ.*, No. 2:16-cv-1119-TC, 2017 WL 706191, at *2 (D. Utah Feb. 22, 2017) ("State universities (of which Weber State is one), are arms of the state rather than independent entities.").

[59] *LaFavre v. Kansas ex rel. Stovall*, 6 Fed. App'x 799, 802 (10th Cir. 2001) (unpublished).

[60] *Univ. of Utah v. Shurtleff*, 252 F. Supp. 2d 1264, 1286 (D. Utah 2003) (dismissing the plaintiff's state law claims due to the defendants' Eleventh Amendment immunity).

[61] *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002).

[62] *Id*.

[63] *Agensys, Inc. v. Regents of the Univ. of Cal.*, No. CV 24-3961-JFW(PDX), 2024 WL 5679166, at *5 (C.D. Cal. Oct. 22, 2024) ("[C]ourts have consistently concluded that Congress did not abrogate sovereign immunity with respect to the DTSA, and, as a result, DTSA claims against states or state entities are barred by Eleventh Amendment sovereign immunity."); *Evans v. Presidio Tr.*, No. 19-cv-08025-HSG, 2020 WL 6802422, at *3 (N.D. Cal. Nov. 19, 2020) ("Plaintiff has not identified and the Court has not found a provision in the DTSA that contains

of Utah has not waived its Eleventh Amendment immunity by statute[64] nor has WSU

affirmatively waived its Eleventh Amendment immunity in this case.

Therefore, WSU is entitled to Eleventh Amendment immunity, and this Court thus lacks

subject-matter jurisdiction over the claims against WSU.[65] Consequently, those claims must be

dismissed without prejudice.[66]

## B.    CLAIMS AGAINST OGDEN

Ogden asserts its entitlement to sovereign immunity in its Motion to Dismiss. Ogden, as a

municipality, is not entitled to Eleventh Amendment immunity.[67] Instead, any immunity Ogden

---

[64] *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1233 (10th Cir. 1999) ("We have previously held that Utah has not waived its Eleventh Amendment immunity by statute."). The UGIA expressly does not waive Eleventh Amendment immunity, providing that "[n]othing in this chapter may be construed as adversely affecting any immunity from suit that a governmental entity or employee may otherwise assert under state or federal law." Utah Code Ann. § 63G-7-702(2). Additionally, the UTSA says nothing of sovereign immunity, and there is thus nothing that can be construed as a waiver unequivocally expressed. *See* Utah Code Ann. §§ 13-24-1–13-24-9; *see also Flute v. U.S.*, 808 F.3d 1234, 1242 (10th Cir. 2015) ("[W]aivers of sovereign immunity must be unequivocally expressed.").

[65] It should be noted that under the *Ex parte Young* doctrine, a plaintiff may bring "a suit against state officials in their official capacities if it seeks prospective relief for the officials' ongoing violation of federal law." *Harris v. Owens*, 264 F.3d 1282, 1290 (10th Cir. 2001). However, the doctrine "has no application in suits against the States and their agencies." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). Here, Plaintiffs seek injunctive relief directly against WSU and have not named any officials. Thus, the *Ex parte Young* doctrine is inapplicable in this case, and Eleventh Amendment immunity bars any claims for injunctive relief against WSU.

[66] *Colby v. Herrick*, 849 F.3d 1273, 1278 (10th Cir. 2017) ("Eleventh Amendment immunity is jurisdictional. . . . As a result, these dismissals should . . . [be] without prejudice.").

[67] *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) ("In terms of scope, Eleventh Amendment immunity extends to states and state entities but not to counties, municipalities, or other local government entities.").

may have is informed by the Utah Governmental Immunity Act (UGIA), which "codifies in Utah law the concept of sovereign immunity, a principle that the state cannot be sued in its own courts without its consent."[68]

## I.    Utah Governmental Immunity Act[69]

The Utah Governmental Immunity Act provides that "each governmental entity . . . [is] immune from suit for any injury that results from the exercise of a governmental function."[70] Ogden, as a city, is a governmental entity under the UGIA, which defines "governmental entity" as "the state and its political subdivisions"[71] and "political subdivision" as "any county, city, town . . .."[72] Utah courts apply a three-part test to determine whether a governmental entity is immune from suit under the UGIA: "(1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived from the particular activity; and (3) whether there is an exception to that waiver."[73]

---

[68] *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1222 (10th Cir. 2022).

[69] "Potential plaintiffs who look to bring a claim against a governmental entity . . . must carefully comply with the UGIA's notice-of-claims provisions. If they do not do so, the district court lacks subject matter jurisdiction over the claim and must dismiss it." *Pinder v. Duchesne Cnty. Sheriff*, 2020 UT 68, ¶ 66, 478 P.3d 610 (citation modified). Plaintiffs have represented to the Court that they served both Ogden and WSU with Notices of Claim on June 10, 2024. *See* ECF No. 10. Neither Defendant has challenged the sufficiency of these Notices. Thus, based on these representations, the Court will assume it has jurisdiction to consider the claims against Ogden.

[70] Utah Code Ann. § 63G-7-201(1). "As a general rule, a court should apply the version of the act that was in effect at the time of the events giving rise to the suit." *Judkins v. Jenkins*, 996 F. Supp. 2d 1155, 1163 (D. Utah 2014). Plaintiffs' SAC alleges actions spanning from 2021 to 2023. Where the relevant provision was not altered in those years such that it remained identical to the current version, the Court will refer to the current version of the UGIA.

[71] Utah Code Ann. § 63G-7-102(4)(a).

[72] *Id*. § 63G-7-102(8).

[73] *Van De Grift v. State*, 2013 UT 11, ¶ 8, 200 P.3d 1045 (Utah 2013).

Plaintiffs assert that the first prong of the governmental immunity test cannot be met with regard to any of the claims against Ogden because Ogden's engaging in a commercial enterprise with a private company does not constitute a governmental function. The UGIA defines "[g]overnmental function" as "each activity, undertaking, or operation performed by a department, employee, agent, or officer of a governmental entity."[74] The Utah Supreme Court has recognized the breadth of this definition.[75] "The legislature has continued to expand the definition of 'governmental function' . . . and the statute currently defines the term as encompassing anything the government decides to do."[76]

Thus, it is the Utah Supreme Court that has interpreted "governmental function" as "anything the government decides to do,"[77] and contrary to Plaintiffs' suggestions, Ogden did not come up with the interpretation itself. Plaintiffs argue, however, that "governmental function" should be limited to an activity traditionally viewed as governmental. In doing so, they rely on *Standiford v. Salt Lake City Corporation*[78] in which "the Utah Supreme Court adopted a common law definition for governmental function, concluding that to qualify for immunity, 'the activity under consideration [must be] of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of a governmental activity.'"[79] This definition "was superseded by statute decades ago."[80] Utah courts "now apply the legislature's

---

[74] Utah Code Ann. § 63G-7-102(5)(b).

[75] *See Scott v. Universal Sales, Inc.*, 2015 UT 64, ¶ 58, 356 P.3d 1172.

[76] *Id.*

[77] *Id.*

[78] 605 P.2d 1230 (Utah 1980).

[79] *Graves v. Utah Cnty. Gov't*, 2024 UT App 80, ¶ 17, 551 P.3d 1029 (alterations in original) (quoting *Standiford*, 605 P.2d at 1236–37).

[80] *Id.* Plaintiffs mention that the Utah Supreme Court has since used the test articulated in *Standiford* in determining whether the broad interpretation of the UGIA violates the Open Courts

broad statutory definition that 'encompass[es] anything the government decides to do.'"[81] This Court is not at leisure to veer from the Utah state courts' interpretation of Utah law, and even if it were, Plaintiffs have failed to offer any compelling reason to do so.[82]

---

Clause of the Utah State Constitution as applied in a particular case. *See Scott*, 2015 UT 64 at ¶ 59; Utah Const. art. I, § 11. However, here, it does not appear that Plaintiffs have presented a challenge to the Open Courts Clause. To the extent that they have in fact attempted to do so, the challenge has not been properly presented such that it can be considered. To determine whether a legislative act violates the Open Courts Clause, Utah courts use a three-part test: (1) whether the legislature has abrogated a cause of action, (2) whether the law provides an injured person an effective and reasonable alternative remedy, (3) "[i]f there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existed legal remedy is not an arbitrary or unreasonable means for achieving the objective." *Waite v. Utah Lab. Comm'n*, 2017 UT 86, ¶ 19, 416 P.3d 635. Plaintiffs have not engaged in the analysis above in any substantive way. Therefore, the Court declines to interpret Plaintiffs' arguments as an applied challenge to the Open Courts Clause, thus rendering *Standiford* irrelevant.

[81] *Graves*, 2024 UT App 80 at ¶ 17, 551 P.3d 1029 (alteration in original) (quoting *Scott*, 2015 UT 64 at ¶ 68).

[82] While Plaintiffs' comparison to the dormant Commerce Clause may make interesting fodder for a law review article, the argument is not developed with enough depth here to make any actual connection or conflict apparent. To determine whether an activity unjustifiably discriminates against or burdens interstate commerce in violation of the dormant Commerce Clause, courts first determine whether the government is acting as a market regulator or a market participant, a distinction that is "not often clear." *Wendover City v. W. Wendover City*, 404 F. Supp. 2d 1324, 1328 (D. Utah 2005). The reason for doing this is because "a State acting in its proprietary capacity as a purchaser or seller may favor its own citizens over others." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 592–93 (1997) (citation modified). Plaintiffs have not raised a dormant Commerce Clause challenge in this case but rather argue that viewing "governmental function" under the UGIA broadly may somehow impact whether a state can be seen as a market participant. But the market participation doctrine is part of a separate inquiry in a context separate from whether an activity is a "governmental function" under the UGIA. While there may theoretically be some overlap depending on the facts of a particular case, any conflict is too unclear from Plaintiffs' arguments alone for the Court to comment on the issue in any meaningful way.

Similarly, Plaintiffs' brief mention of antitrust law and the state-action doctrine involves a separate inquiry in a separate context. Again, Plaintiffs' arguments do not clearly establish a connection with the UGIA issues in this case, remaining, rather, in the land of the theoretical. Thus, the Court declines to comment substantively on this issue.

Here, Ogden decided to explore the building of a Utah Catalyst Campus, including a SCIF. While this undertaking involved partnering with a private enterprise, it falls within the broad definition of "governmental function" under the UGIA. Therefore, the first prong of the UGIA governmental immunity test is met, and the Court will now turn to whether the UGIA waives immunity for the claims Plaintiffs assert against Ogden.

1.    *Violation of the DTSA (Count 1)*

Ogden attempts to assert UGIA immunity against Plaintiffs' DTSA claims. But the UGIA does not apply to federal claims. This is evident from the language of the statute itself. The UGIA provides that "[t]he scope of the waivers and retentions of immunity found in this comprehensive chapter: . . . (b) governs all claims against governmental entities or against their employees or agents arising out of the performance of the employee's duties, within the scope of employment, or under color of authority."[83] The UGIA defines "claim" as "any asserted demand for or cause of action for money or damages, whether arising under the common law, under state constitutional provisions, or under state statutes, against a governmental entity or against an employee in the employee's personal capacity."[84] Notably absent from "arising under the common law, under state constitutional provisions, or under state statutes" is anything regarding federal law. Thus, actions brought pursuant to federal law are outside the scope of the UGIA's immunities.[85]

---

[83] Utah Code Ann. § 63G-7-101(2)(b).

[84] *Id.* at § 63G-7-102(2).

[85] Furthermore, federal courts are reticent to apply state-law immunity defenses and privileges to federal causes of action because it disrupts the proper balance of federal-state power under the Supremacy Clause. *See, e.g.,* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ."); *Martinez v. Cal.*, 444 U.S. 277, 284 n.8 (1980) (In the § 1983 context, "[a] construction of the federal statute which permitted a state immunity defense to have controlling

While the UGIA does not bar Plaintiffs' DTSA claims, the allegations in Plaintiff's Second Amended Complaint ("SAC") are insufficient to state a claim upon which relief can be granted. "To establish a claim under the DTSA, the plaintiff must demonstrate (1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce."[86]

"For the first element, a 'trade secret' may include 'all forms and types of financial, business, scientific, technical, economic, or engineering information."[87] For information to qualify as a trade secret,

> (1) the owner must have "taken reasonable measures to keep such information secret," and (2) the information must derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]"[88]

Here, Plaintiffs allege that they kept trade secrets in the form of "(1) OGC's business model for (a) building facilities and infrastructure necessary for the development of a Catalyst Campus and (b) the development, construction, and establishment of a SCIF, and (2) CCTI's business model for the administration, contracting, collaboration, and operation of Catalyst Campus with the government and third parties."[89] Plaintiffs allege that their trade secrets have independent economic value because they give them a competitive advantage in developing

---

effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced.").

[86] *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1087 (10th Cir. 2025) (citation modified); *see also* 18 U.S.C. § 1836(b)(1).

[87] *Id*. (quoting 18 U.S.C. § 1839(3)).

[88] *Id.* (quoting 18 U.S.C. § 1839(3)).

[89] ECF No. 51 ¶¶ 130, 154.

Catalyst Campuses.[90] Plaintiffs also allege that this knowledge was "compiled over years through their substantial investment of money and resources," and is "not readily available to the public and [] not readily ascertainable or duplicated by others."[91] However, Plaintiffs do not allege facts to support that they have taken reasonable measures to keep this information secret, relying only on a conclusory allegation.[92] Without any factual support, this allegation is insufficient to state a claim,[93] and thus Plaintiffs' allegations do not establish the existence of a trade secret.

Because Plaintiffs' allegations do not establish the existence of a trade secret,[94] the Court will dismiss this claim against Ogden for failure to state a claim. However, the Court will grant this dismissal without prejudice, and Plaintiffs may seek leave to amend if they so choose.[95]

---

[90] *Id.*

[91] *Id.* ¶¶ 134–35, 158–59.

[92] *Id.* ¶¶ 138, 162 ("OGC and CCTI have taken reasonable efforts to safeguard the secrecy of their secrets.").

[93] *See Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) ("[M]ere labels and conclusions and a formulaic recitation of the elements of a cause of action will not suffice." (citation modified)); *see also Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 679 F. Supp. 3d 1196, 1210–12 (D. Utah 2023) (holding that a plaintiff's allegations sufficiently stated a claim for relief under the DTSA where the plaintiff alleged the information was protected by numerous safeguards including agreements and password protected software programs).

[94] Even if Plaintiffs' allegations did establish the existence of a trade secret, they have not clearly alleged whether the trade secrets implicate interstate or foreign commerce. While it seems likely that Plaintiffs' business model implicates interstate commerce as the Catalyst Campus serves to support the Department of Defense, the ways in which it does should not be left to the Court's imagination.

[95] *See Brever v. Rockwell Intern. Corp.*, 40 F.3d 1119, 1131 (10th Cir. 1994) (noting that a court should dismiss with leave to amend if it is at all possible that the nonmovant can correct the defect or state a claim for relief).

2.   *Misappropriation of Trade Secrets under the UTSA (Count 2)*

Ogden asserts that it is immune under the UGIA from Plaintiffs' UTSA claim. Because this is a state-law claim, the UGIA analysis for the DTSA claim above does not apply. Rather, pursuant to the UGIA, "[a] governmental entity . . . retain[s] immunity from suit unless that immunity has been expressly waived in [the UGIA]."[96] None of the waivers of immunity detailed in Section 63G-7-201 expressly speak of misappropriation of trade secrets. Plaintiffs, however, point to Section 63G-7-301(2)(i), which provides that "[i]mmunity from suit of each governmental entity is waived . . . as to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment[,]" arguing that their misappropriation claim is grounded in negligence.

To establish a misappropriation claim under the UTSA, Plaintiffs must show "two essential elements: (1) existence of a protectable 'trade secret' of a plaintiff and (2) demonstration of 'misappropriation by a defendant.'"[97] The UTSA defines "misappropriation" as

> (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (b) disclosure or use of a trade secret of another without express or implied consent by a person who:
> > (i) used improper means to acquire knowledge of the trade secret; or
> > (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> > > (A) derived from or through a person who had utilized improper means to acquire it;
> > > (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > > (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

---

[96] Utah Code Ann. § 63G-7-101(3).

[97] *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 24, 364 P.3d 1013 (quoting Utah Code Ann. § 13-24-2).

(iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.[98]

This definitional language denotes a level of intentionality,[99] and in considering a similar statute in another state, the Seventh Circuit expressly stated that "[t]he misappropriation of a trade secret is an intentional tort."[100]

Nonetheless, this Court need not determine whether misappropriation of a trade secret is an intentional tort that may never sound in negligence because Plaintiffs' SAC clearly premises the claim on intentional, not negligent, conduct. Consider the following allegations from the SAC: "Defendants have used and *intend* to use CCTI and OGC's trade secrets for their own economic benefit and gain;"[101] "[Defendants] *knew* that Brown was misusing trade secrets and proprietary information gained from OGC and CCTI;"[102] "Upon information and belief, [Defendants] *encouraged* Brown to betray her fiduciary obligations to Plaintiffs;"[103] "[Defendants] have *received and leveraged* trade secret information provided by Brown and incorporated into or used that information in their own business methods and practices;"[104] "Defendants' misappropriation of CCTI and OGC's trade secrets has been conducted in a *willful and malicious manner* . . . ."[105] In this way, Plaintiffs' contention that this tort sounds in

---

[98] Utah Code Ann § 13–24–2(2).

[99] *See id.* (using terms like "acquisition," "disclosure," "us[ing] improper means to acquire").

[100] *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654 (7th Cir. 1998).

[101] ECF No. 51 ¶ 172 (emphasis added).

[102] *Id.* ¶ 125 (emphasis added).

[103] *Id.* ¶ 126 (emphasis added).

[104] *Id.* ¶ 169 (emphasis added).

[105] *Id.* ¶ 176 (emphasis added). "The word 'willful' is widely used in the law, and, although it has not by any means been given a perfectly consistent interpretation, it is generally understood to

negligence conflicts with their own allegations. Plaintiffs have alleged the misappropriation claim as an intentional tort, and thus the UGIA's waiver of immunity for negligent acts or omissions does not apply. On the contrary, there is no waiver of immunity under the UGIA for intentional torts.[106]

Although it appears from the UGIA itself that the UGIA retains immunity from UTSA claims, Plaintiffs further argue that the UTSA statutorily waives UGIA immunity by defining a "person" in relevant part as the "government," a "governmental subdivision," or "agency."[107] "[W]hile the [UGIA] grants broad, background immunity to the state and its subdivisions in their roles as public servants, the Act also explicitly recognizes that such immunity can be statutorily waived."[108] The UTSA contains nothing expressly stating that immunity is waived. But the Utah Supreme Court has found that Utah consented to suit under the Utah Whistleblower Act on account of its definition of "employer."[109]

In *Hall*, the plaintiff brought claims against the Utah Department of Corrections under the Utah Whistleblower Act. The Utah Supreme Court ruled that the UGIA did not immunize the Department of Corrections from suit because the Whistleblower Act allowed claims against employers, and it defined "employer" as an "employing state agency or political subdivision of the state."[110] It also reasoned that barring such claims would undercut the legislature's intent to

---

refer to conduct that is not merely negligent." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

[106] *Miller v. Utah*, 638 F. App'x 707, 715 (10th Cir. 2016) (unpublished).

[107] Utah Code Ann. § 13-24-2(3).

[108] *Hall v. Utah State Dep't of Corrections*, 2001 UT 34 ¶ 18, 24 P.3d 958

[109] *See id.* ("[W]e find that the Governmental Immunity Act does not protect the state and its political subdivisions from lawsuits arising under the Whistleblower Act.").

[110] *Id.* ¶ 17.

protect from retribution public employees who report waste of public resources or violations of laws, rules, and regulations.[111]

*Hall* is distinguishable from the present matter. Here, Plaintiffs cite no relevant legislative history indicating an intent to waive sovereign immunity for trade secret misappropriation, and the Court can find none. Though the scope of the definitions of "employer" in the Whistleblower Act and "person" under the UTSA are somewhat similar, the Court has no factual proffer to infer that Utah meant to waive governmental immunity with respect to the UTSA.[112] Moreover, the UTSA provides that it "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of the chapter among states enacting it."[113] Three other state courts interpreting immunity in the context of the Uniform Trade Secrets Act have considered this question and have ruled that immunity was not waived.[114] In sum, given the lack of an express waiver, the UTSA's command to construe the law uniformly with other states' Uniform Trade Secrets Acts, and the lack of clear legislative intent to authorize misappropriation

---

[111] *Id.* ¶ 19.

[112] The Georgia Court of Appeals found the same in *Board of Regents of the University System of Georgia v. One Sixty Over Ninety, LLC*. 830 S.E.2d 503, 507–09 (Ga. Ct. App. 2019). There, the Georgia Court of Appeals found that Georgia's Trade Secrets Act, which defines a "person" as a "government [or] governmental subdivision or agency," did not waive the state's immunity despite Georgia Supreme Court precedent finding immunity was waived for whistleblower claims under definitions similar to Utah's Whistleblower claims. The Georgia Court of Appeals reasoned that "the words of the Act are not so plain, clear, and unmistakable as to leave no doubt as to the intention of the [Georgia legislature] that waiver of sovereign immunity may be implied, or was even intended . . . ." *Id.* at 509 (citation modified).

[113] Utah Code Ann. § 13-24-9; *see also CDC Restoration & Constr., LC v. Tradesmen Contrs., LLC*, 2012 UT App 60, ¶ 45, 274 P.3d 317 (joining the majority of courts in interpreting UTSA provisions "to make uniform [trade secret] law" (alteration in original)).

[114] *One Sixty Over Ninety, LLC*, 830 S.E.2d at 507–09; *Mgmt. Ass'n of Ill. v. Bd. of Regents*, 618 N.E.2d 694, 707–08 (Ill. Ct. App. 1993); *GR Vending CT, LLC v. Dep't of Consumer Prot.*, No. HHDCV196109300S, 2019 WL 5858038, at *4–8 (Conn. Oct. 22, 2019).

claims against governmental entities, the Court declines to find that the UTSA statutorily waives Ogden's UGIA immunity for this claim.

Because Ogden is entitled to UGIA immunity, the Court will dismiss Plaintiffs' UTSA insofar as it seeks monetary damages.[115] However, Plaintiffs also seek injunctive relief pursuant to their UTSA claim.[116] Injunctive relief actions are not subject to the UGIA because they are not "asserted demand[s] for or cause[s] of action for *money or damages*."[117] Thus, the UGIA does not prohibit Plaintiffs from pursuing their UTSA claim for injunctive relief.

Despite this, Plaintiffs' UTSA claim suffers from the same deficiency as their DTSA claim. "The elements of a claim for trade secret misappropriation under the DTSA and UTSA closely resemble each other."[118] As a reminder, to establish a misappropriation claim under the UTSA, Plaintiffs must show "two essential elements: (1) existence of a protectable 'trade secret' of a plaintiff and (2) demonstration of 'misappropriation by a defendant.'"[119] Information qualifies as a trade secret under the UTSA if "such materials (a) 'derive[ ] independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from [their] disclosure or use,' and (b) are 'the subject of efforts that are reasonable under the circumstances to maintain [their]

---

[115] *See* Utah Code Ann. 63G-7-102(2) ("'Claim' means any asserted demand for or cause of action for money or damages . . .").

[116] ECF No. 51 at 53.

[117] *See id*. (emphasis added); *see also Houghton v. Utah Dep't of Health*, 2005 UT 63, ¶ 19 n.3, 125 P.3d 860 (recognizing that "equitable claims are not governed" by the UGIA's notice-of-claim provisions); *Jenkins v. Swan*, 675 P.2d 1145, 1154 (Utah 1983) (holding that equitable claims, such as claims for declaratory relief, are not subject to the UGIA).

[118] *Total Quality Sys.*, 679 F. Supp. 3d 1196 at 1210.

[119] *Mercer*, 2015 UT 80 at ¶ 24.

secrecy.'"[120] As with the DTSA claim, Plaintiffs' allegations fail to establish that the information at issue was "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy,"[121] relying instead on the conclusory allegation that Plaintiffs have made reasonable efforts to safeguard the secrecy of their secrets. Without factual allegations to support this assertion, Plaintiffs fail to establish the existence of a trade secret, and in turn, Plaintiffs fail to state a UTSA claim for injunctive relief.

Therefore, in sum, Plaintiffs' claim for monetary damages under the UTSA against Ogden is dismissed with prejudice as it is barred by the UGIA. Plaintiffs' claim for injunctive relief under the UTSA against Ogden is dismissed without prejudice, and Plaintiffs may seek leave to amend if they so choose.

3.    *Intentional Torts (Counts 4, 6, 8, 9, 10)*

Plaintiffs bring claims against Ogden for aiding and abetting breach of fiduciary duty of loyalty, aiding and abetting breach of fiduciary duty of care, aiding and abetting breach of fiduciary duty of good faith, intentional interference with economic relations, and fraudulent inducement. Ogden argues that these claims must be dismissed because the UGIA does not waive immunity for intentional torts. Ogden is correct.

---

[120] *Id*. ¶ 25 (alterations in original) (quoting *Utah Code Ann.* § 13–24–2(4))

[121] *Id*.

"There are no provisions in the [UGIA] waiving immunity for intentional torts."[122] Intentional interference with economic relations[123] and fraudulent inducement[124] are intentional torts. As for the claims for aiding and abetting the breaches of fiduciary duties, "[a] party aids and abets the breach of a fiduciary duty when it 'knowingly join[s] a fiduciary in fraudulent acts, whereby the fiduciary breaches his or her fiduciary duties,' and is therefore 'jointly and severally liable with that fiduciary.'"[125] "[T]he gravamen of the claim of aiding and abetting a breach of fiduciary duty is the defendant's knowing participation in the fiduciary's breach."[126] Aiding and abetting the breaches of a fiduciary duties are thus intentional torts.

Because the UGIA contains no waiver of immunity for intentional torts, Ogden is immune from suit for these claims, and the Court will dismiss these claims with prejudice.

### 4.    Negligent Misrepresentation (Count 11)

Ogden asserts that Plaintiffs' claim for negligent misrepresentation must be dismissed because immunity has been expressly retained under the UGIA. Ogden's argument is correct. While the UGIA waives immunity "as to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment,"[127] the UGIA provides several exceptions to this waiver. Relevant here, the UGIA does not waive immunity "for any

---

[122] *Miller*, 638 F. App'x at 715.

[123] *Pingree v. Univ. of Utah*, No. 2:20-cv-00724-JNP-CMR, 2022 WL 1307902, at *5 (D. Utah May 2, 2022) ("To the extent Pingree alleges intentional interference with business relations, the UGIA contains no waiver of immunity for intentional torts.").

[124]*Anderson v. Kriser*, 2011 UT 66, ¶ 25, 266 P.3d 819 ("fraud is an intentional tort") (citation modified).

[125] *Hussein v. UBS Bank USA*, 2019 UT App 100, ¶ 46, 446 P.3d 96 (alterations in original) (quoting *Russell/Packard Dev., Inc. v. Carson*, 2003 UT App 316, ¶ 33, 78 P.3d 616).

[126] *Id*.

[127] Utah Code Ann. § 63G-7-301(2)(i)

injury proximately caused by a negligent act or omission of an employee committed within the scope of out of or in connection with, or results from . . . (f) a misrepresentation by an employee whether or not the misrepresentation is negligent or intentional."[128] Because the UGIA expressly retains immunity from negligent misrepresentation suits, Plaintiffs' claim for negligent misrepresentation is barred against Ogden. The Court will therefore dismiss this claim with prejudice.

### 5.    *Civil Conspiracy (Count 12)*

Ogden argues that civil conspiracy is an intentional tort. Despite that there is case law identifying it as such,[129] the legal reality of this claim is much more complicated. The Utah Supreme Court has emphasized that civil conspiracy is a "cause of action distinguishable, independent, and unrelated to tort law"[130] such that "[l]umping civil conspiracy into the realm of intentional torts would serve to eliminate civil conspiracy as a cause of action altogether."[131] This is because, rather than being an independent tort, civil conspiracy is more accurately described as a theory of liability "allowing a plaintiff injured by the tort of one party to join and recover from a third party who conspired with the tortfeasor to bring about the tortious act or in other words, a method of imposing vicarious liability."[132]

---

[128] *Id.* at § 63G-7-201(4)(f).

[129] *Cannon v. PNC Bank, N.A.*, No. 2-15-cv-00131-BSJ, 2016 WL 9779290, at *7 (D. Utah Aug. 31, 2016) ("Moreover, intentional tort claims such as civil conspiracy and tortious interference with contract . . .").

[130] *Jedrziewski v. Smith*, 2005 UT 85, ¶ 15, 128 P.3d 1146.

[131] *Id.* ¶ 9.

[132] *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 803 (D. Utah 1988).

Regardless, "[k]nowing, intentional acts are required to form the foundation of a conspiracy."[133] To establish a civil conspiracy, a "plaintiff must show the following elements: (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof."[134] The UGIA contains no express waiver of immunity for civil conspiracy claims or for the intentional torts upon which those claims are predicated.[135] Thus, Ogden is immune from suit on this claim under the UGIA.[136]

Moreover, even if UGIA immunity were not at issue, Plaintiffs have failed to adequately state their civil conspiracy claim because they do not allege facts plausibly showing a meeting of the minds. Plaintiffs allege that "Defendants engaged in a conspiracy through cooperation and coordination with knowledge of each party's intent."[137] But the SAC is lacking in factual allegations to support this. Plaintiffs allege that "Brown was working to convince WSU and Ogden . . . that OGC and CCTI were not needed"[138] and that "Ogden . . . and WSU acquiesced and encouraged Brown to cut OGC and CCTI out of the venture."[139] Despite that these allegations lean toward being conclusory, even were the Court to accept them as true, they only potentially show a meeting of the minds to cut Plaintiffs out of the venture. But the "objects to be

---

[133] *Jedrziewski*, 2005 UT 85 at ¶ 9.

[134] *Israel Pagan Est. v. Cannon*, 746 P.2d 785, 790 (Utah Ct. App. 1987).

[135] *See Estrada v. Mendoza*, 2012 UT App 82, ¶ 13, 275 P.3d 1024, 1029 (The claim of civil conspiracy requires, as one of its essential elements, an underlying tort." (citation modified)).

[136] *See Haik v. Salt Lake City Corp.*, No. 2:12-cv-997-TS, 2013 WL 968141, at *10 (D. Utah Mar. 12, 2013), *aff'd*, 567 F. App'x 621 (10th Cir. 2014) (holding the plaintiffs' civil conspiracy claim "would be barred for various reasons under the Utah Governmental Immunity Act.").

[137] ECF No. 51 ¶ 277.

[138] *Id*. ¶ 100.

[139] *Id*. ¶ 115.

accomplished" Plaintiffs plead as the basis for their civil conspiracy claim are as follows: securing proprietary trade secrets and business information; inducing OGC to purchase the Washington Building; inducing and using Plaintiffs to secure $20 million; breaching Defendant Brown's fiduciary duties; interfering with Plaintiffs' economic relationships; and fraudulently or negligently inducing Plaintiffs into participating in the venture.[140] There are insufficient factual allegations in the SAC that show a meeting of the minds to accomplish these allegedly tortious acts. Indeed, OGC purchased the Washington Building before Plaintiffs allege Defendant Brown was even introduced to WSU's CFO, so it seems implausible that Defendants could have worked in concert to accomplish that object. Thus, Plaintiffs have failed to state a plausible claim for relief.

In sum, because the UGIA bars this claim against Ogden, the claim is dismissed with prejudice.

6.    *Contractual Claims (Counts 13 and 14)*

Plaintiffs bring claims for breach of an implied-in-fact contract, breach of an implied-in-law contract, and a claim for breach of the implied covenant of good faith and fair dealing. Ogden concedes that the UGIA waives immunity from suit "as to any contractual obligation."[141] Instead, Ogden City argues that a city ordinance precludes the contract claims and that there was no meeting of the minds.

Under Utah law, "[q]uantum meruit has two distinct branches—contracts implied in law and contracts implied in fact."[142] Although the parties' arguments fail to clearly distinguish

---

[140] *Id.* ¶ 276.

[141] Utah Code Ann. § 63G-7-301(1)(a).

[142] *Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, ¶ 44, 355 P.3d 1000.

between these two branches, Plaintiffs' SAC does, and thus the Court should analyze each in turn. "Contracts implied in law, also termed quasi-contracts or unjust enrichment, 'is a doctrine under which the law will imply a promise to pay for goods or services when there is neither an actual nor an implied contract between the parties.'"[143] A meeting of the minds is not required for a claim for a contract implied in law.[144] Contracts implied in fact, on the other hand, result "when 'there is a manifestation of mutual assent, by words or actions or both, which reasonably are interpretable as indicating an intention to make a bargain with certain terms or terms which reasonably may be made certain.'"[145]

### 6.1    Contract Implied in Fact

As a threshold matter, Plaintiffs argue that the city ordinance conflicts with the UGIA because the UGIA authorizes suit for all contract claims. The Ogden City Ordinance provides requisite formalities that must occur for a contract to become valid or binding against the city:

> (1) the contract has been reduced to writing; (2) the city has received from the department of management services that funds are lawfully available within budgeted appropriations to fulfill the city's financial obligations thereunder; (3) where appropriate, there is appropriate certification of compliance with federal contract or grant assurances and the documents are approved as to form by the city attorney or an assistant city attorney; (4) the contract has been executed by the mayor or the mayor's designee authorized to sign in a prior adopted written executive order; and (5) the signature has been attested by the city recorder or a deputy city recorder.[146]

---

[143] *Id*. (quoting *Concrete Prods. Co. v. Salt Lake Cnty.*, 734 P.2d 910, 911 (Utah 1987).

[144] *Id*.

[145] *Heideman v. Washington City*, 2007 UT App 11, ¶ 25, 155 P.3d 900 (quoting *Rapp v. Salt Lake City*, 527 P.2d 651, 654 (Utah 1974)).

[146] City Code of Ogden City, Utah 4-2A-3, https://codelibrary.amlegal.com/codes/ogdencityut/latest/ogdencity_ut/0-0-0-6997#JD_4-2A-3. "Federal Rule of Evidence 201 authorizes federal courts to take judicial notice of adjudicative facts, including provisions in municipal ordinances, at any stage of the proceedings." *Boyz Sanitation Serv., Inc. v. City of Rawlins*, 888 F.3d 1189, 1196 n.9 (10th Cir. 2018).

Ogden does not assert that it is immune from suit due to the city ordinance. It claims, rather, that it did not have the power to enter into an implied contract as a matter of law. Thus, there is no conflict between the UGIA and the city ordinance because the first deals with immunity from suit while the second speaks to the capacity to enter into a contract that may give rise to the cause of action.

Turning first to Plaintiff's claim for breach of contract implied in fact, the Utah Supreme Court has held that "[a]ny contract, express or implied . . . is subject to the statutory and constitutional limitations on the [governmental entity] as a governing body."[147] "Any act by the [governmental entity] in excess of this authority or forbidden by the Utah Constitution is null and void as an ultra vires act."[148] The city ordinance requires several formalities to be fulfilled for a contract to be valid against Ogden, and Plaintiffs neither allege in their Complaint nor argue in their Opposition that any of these formalities were fulfilled. As such, "plaintiff's theory must fail since no contractual liability can be created without compliance with the previously cited ordinance[]."[149] "One who deals with a municipal corporation does so at his peril. He is presumed to know the municipal ordinances controlling the administration of public business and the limitations on the powers and authority of the City officers he is dealing with."[150] "Every person contracting with a municipal corporation, or one who proposes to enter into a contract with such corporation, is bound to take notice of the provisions of the city ordinances and any limitations therein contained."[151] Here, there can be no manifestation of mutual assent that could

---

[147] *Weese v. Davis Cnty. Comm'n*, 834 P.2d 1, 3 (Utah 1992).

[148] *Id.*

[149] *Rapp*, 527 P.2d at 654.

[150] *Thatcher Chem. Co. v. Salt Lake City Corp.*, 455 P.2d 769, 771 (Utah 1968).

[151] *Id.*

reasonably be interpreted as an intent to make a bargain because Ogden lacks the capacity to enter into an agreement without fulfilling the requisite formalities. Plaintiffs have thus failed to state a claim for relief that can be granted, and the Court will dismiss this claim for breach of contract implied in fact with prejudice.[152]

### 6.2    *Contract Implied in Law*

To establish the existence of a contract implied in law, a plaintiff must show the following: "(1) [t]he defendant received a benefit; (2) an appreciation or knowledge by the defendant of the benefit; (3) under such circumstances that would make it unjust for the defendant to retain the benefit without paying for it."[153] A contract implied in law "is not a true contract but is based on unjust enrichment or restitution."[154] Nonetheless, "a proceeding at law for restitution is an action of contract,"[155] and the Utah Supreme Court has held that a plaintiff would still encounter "the statutory requirements which mandate his contractual obligation is void without fulfillment of the requisite formalities."[156] Here, where the requisite formalities were not fulfilled such that any contract would be void, the Court will not impute upon Ogden a promise to fulfill some obligation, as the injustice under these circumstances is tenuous because Plaintiffs should have been aware of the clear, published limitations on Ogden's authority. Therefore, Plaintiffs' claim against Ogden is dismissed with prejudice.

---

[152] "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006). Here, as the required formalities were not fulfilled, Plaintiffs cannot possibly show a manifestation of mutual assent that could reasonably be interpreted as an intent to make a bargain. Amendment would thus be futile.

[153] *Emergency Physicians Integrated Care v. Salt Lake Cnty.*, 2007 UT 72, ¶ 11, 167 P.3d 1080.

[154] *Fowler v. Taylor*, 554 P.2d 205, 208 (Utah 1976).

[155] *Rapp*, 527 P.2d at 655.

[156] *Id*.

*6.3    Breach of the Covenant of Good Faith and Fair Dealing*

"An implied covenant of good faith and fair dealing inheres in every contract."[157] But Utah courts have "consistently rejected the notion of a free-standing implied covenant of good faith and fair dealing in the absence of a contract."[158] As explained above, Plaintiffs have failed to establish the existence of a contract implied in fact or implied in law. Therefore, no true contract or contractual relationship exists to serve as a basis for this implied covenant of good faith and fair dealing claim.[159] Plaintiffs' claim against Ogden is thus dismissed with prejudice.

## **ORDER**

For the reasons discussed above, the Court GRANTS Defendant WSU's Motion to Dismiss (ECF No. 54). All claims against WSU are DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction.

It is further ORDERED that Defendant Ogden's Motion to Dismiss (ECF No. 53) is GRANTED as follows:

- Counts 4, 6, 8–14 against Ogden are DISMISSED WITH PREJUDICE. Additionally, Plaintiff's claim under Count 2 against Ogden is DISMISSED WITH PREJUDICE insofar as it seeks monetary damages.

- Count 1 against Ogden is DISMISSED WITHOUT PREJUDICE. Plaintiff's claim under Count 2 seeking injunctive relief against Ogden is DISMISSED WITHOUT PREJUDICE. Plaintiffs may file a motion to amend these claims within 21 days if they so choose.

---

[157] *Eggett v. Wasatch Energy Corp.,* 2004 UT 28, ¶ 14, 94 P.3d 193.

[158] *Tomlinson v. NCR Corp.*, 2014 UT 55, ¶ 32, 345 P.3d 523.

DATED this 29th day of September 2025.     BY THE COURT:

Ann Marie McIff Allen
United States District Judge